IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH – CENTRAL DIVISION

|  |  |
|---|---|
| UTAH ENVIRONMENTAL CONGRESS,<br><br>Appellant,<br><br>vs.<br><br>ROBERT A. RUSSELL, as Supervisor of the Dixie National Forest; DALE BOSWORTH, as Chief of the Forest Service; UNITED STATES FOREST SERVICE<br><br>Appellees. | **ORDER**<br><br>Case No. 2:05CV00549<br><br>Judge Dee Benson |

Before the Court is Utah Environmental Congress's ("UEC's") appeal of an administrative action brought pursuant to Federal Rule of Appellate Procedure 15 and <u>Olenhouse v. Commodity Credit Corp.</u>, 42 F.3d 1560, (10th Cir. 1994).[1] In its appeal, UEC seeks review and reversal of the United States Forest Service's approval of the Barney Top Resource Management Project ("the Project"). The Court held a hearing on UEC's motion on September 30, 2005. For the reasons set forth below, the Forest Service's action is AFFIRMED.

## BACKGROUND

The Project is located within the Dixie National Forest in the Escalante Ranger District. It encompasses 3,585 acres of public land on the Barney Top and Table Cliff plateaus. The Project area's vegetation consists of spruce/subalpine fir forest, with components of aspen and

---

[1] <u>Olenhouse</u> provides that "[r]eviews of agency action in the district courts must be processed as appeals." 42 F.3d at 1580.

mixed conifer. Sagebrush meadows are scattered throughout. The stated objectives of the Project are

> to improve the balance of age class distribution, decrease stand densities, reduce spruce beetle mortality, and restore interior meadows in the Barney Top spruce/fir forest; to restore both the distribution and balance of the age-classes for aspen clones; to maintain adequate old growth while providing for future stands of old growth spruce and fir by reducing stand risk rating relative to spruce bark beetles; and to provide a long-term system of roads to meet the variety of uses occurring within the project area while protecting its natural resources.

Barney Top Resource Management Project, Decision Notice and Finding of No Significant Impact. To achieve these objectives, the Project contemplates "tree cutting, prescribed fire, fencing, road reconstruction, development of borrow pits, road closures, and road decommissioning." Id. Implementation of the project is to occur over a period of four to six years.

A scoping notice for the Project was sent to interested parties in January 2003, and twenty-six parties responded with comments. In February 2004, the Forest Service initiated a formal thirty-day notice and comment period, and additional comments were received and addressed. The Forest Service also prepared an Environmental Assessment to analyze environmental effects of the Project and potential alternatives. In August 2004, Forest Supervisor Robert Russell issued a Decision Notice and Finding of No Significant Impact. UEC appealed the Forest Supervisor's decision in October 2004, and the Forest Service reviewed and responded to UEC's objections. The Forest Service affirmed the Forest Supervisor's decision in a letter dated December 1, 2004. UEC then petitioned the Court for review. The Court received briefing from the parties, with Garfield County and the Utah Division of Forestry, Fire, and State Lands participating as amici curiae on behalf of the Forest Service.

UEC argues that the Project was approved in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., and the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 et seq. UEC requests that the Court reverse the Forest Service's decision and enjoin work on the Project until all requirements of NEPA and NFMA have been fulfilled.

## STANDARD OF REVIEW

Neither NEPA nor NFMA provides for a private right of action, and this case therefore falls under the aegis of the Administrative Procedure Act, 5 U.S.C. § 706 et seq. Under the Administrative Procedure Act, the Court will affirm the Forest Service's decision unless the decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Court is "not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971). Forest officials are charged with using their expertise to consider environmental factors, and so long as agency discretion is rationally exercised, it will not be second-guessed by the Court. Utah Envtl. Cong. v. Bosworth, 370 F. Supp. 2d 1157, 1162 (D. Utah 2005) (citing Norton v. S. Utah Wilderness Ass'n, 124 S. Ct. 2373, 2381 (2004)).

## ANALYSIS

### I. STANDING

As a preliminary issue, the Forest Service contends that UEC lacks standing to challenge the Project's approval. Specifically, the Forest Service argues that UEC has not shown actual use of the area affected by the Project. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 565-66 (1992) ("[A] plaintiff claiming injury from environmental damage must use the area affected by

3

the challenged activity and not an area roughly in the vicinity of it.") (quotation and citation omitted). A plaintiff who does not show actual use of a project area fails to establish injury in fact, which is required for standing. "Standing requires an injury in fact that is fairly traceable to the challenged action and is likely to be redressed by judicial intervention." Friends of Marolt Park v. United States DOT, 382 F.3d 1088, 1095 (10th Cir. 2004).

Having reviewed the materials submitted by the parties and the administrative record, the Court finds that UEC's members have shown use of the Project area so as to establish standing. UEC's members hike, camp, photograph, and study plants and animals on the land affected by the Project. According to UEC, the Project threatens its members' aesthetic and recreational enjoyment of the land and judicial intervention can remove or lessen this threat. This is sufficient to show injury in fact for purposes of standing. See Friends of Marolt Park, 382 F.3d at 1095 ("FMP has . . . shown that its members make use of the Park for recreational purposes. Thus, FMP has alleged sufficient facts to establish an injury-in-fact for purposes of standing."); see also United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 687 (1973) (finding that the Sierra Club had standing where it claimed that the challenged action would directly harm its members in their use of the natural resources of the Washington metropolitan area). The Forest Service's argument thus fails.

## II. ALLEGED VIOLATIONS OF NEPA

UEC argues that approval of the Project should be reversed because the Forest Service violated NEPA by (1) failing to circulate documents disclosing environmental effects of the Project for public review; (2) failing to adequately analyze the effects of magnesium chloride application; (3) failing to adequately analyze effects of the Project on air quality; and (4) failing

to adequately analyze impacts on soil resources. Each of these arguments will be addressed in turn.

### A. Failure to Circulate Documents Disclosing Environmental Effects

UEC first claims that the Forest Service violated NEPA by not circulating the full Environmental Assessment, or equivalent documents, for public review prior to approving the Project. Although the Forest Service circulated chapter one of the Environmental Assessment, UEC claims that the Forest Service was also required to circulate chapters two, three, and four, or equivalent documents, prior to making a decision. The Forest Service released the full Environmental Assessment shortly after issuing its Decision Notice and Finding of No Significant Impact. In support of its argument, UEC cites 40 C.F.R. § 1501.4(b), which states as follows: "The agency shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing [Environmental Assessments]." UEC also cites 40 C.F.R. § 1506.6, which states that "[a]gencies shall . . . make diligent efforts to involve the public in preparing and implementing their NEPA procedures[,] . . . [p]rovide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected," and "[s]olicit appropriate information from the public."

The Forest Service argues that it did not act arbitrarily or in error because Council of Environmental Quality ("CEQ") regulations do not require circulation of the Environmental Assessment, and because it made sufficient efforts to inform and involve the public. The Court agrees that the Forest Service's efforts were adequate. Courts in several jurisdictions, including the Tenth Circuit, have stated that agencies are not required by CEQ regulations to circulate the

Environmental Assessment for public review. See Greater Yellowstone Coalition v. Flowers, 359 F.3d 1257, 1279 (10th Cir. 2004) (stating that decision not to circulate the Environmental Assessment and other project documents before issuance of agency decision was not arbitrary).[2] In addition, the record shows that the Forest Service took several steps to involve the public in its decision to implement the Project. On January 7, 2003, the Forest Service sent out a scoping letter for the Project identifying the proposed action, the purpose and need for the proposed action, and the Project's location. UEC submitted comments to this letter. UEC also submitted comments in February 2004 during the formal notice and comment period. During that period, UEC requested GIS data and a road analysis report, which the Forest Service provided. Looking at these facts, the Court concludes that UEC was afforded adequate opportunity to provide its views and that the Forest Service substantially complied with public involvement requirements. See Burke v. Board of Governors, 940 F.2d 1360, 1365 (10th Cir. 1991) (The federal courts "are limited to determining whether the agency substantially complied with statutory and regulatory procedures . . . .").

    B.    Failure to Analyze Effects of Magnesium Chloride Application

UEC next argues that the Forest Service did not sufficiently assess the potential effects of applying magnesium chloride to forest roads for dust abatement. UEC contends that NEPA regulations require an analysis of direct and indirect impacts caused by a proposed project and

---

[2] See also Alliance to Protect Nantucket Sound Inc. v. United States Dept. of Army, 398 F.3d 105, 115 (1st Cir. 2005); Pogliani v. United States Army Corps of Eng'rs, 306 F.3d 1235, 1238 (2nd Cir. 2002); Fund for Animals, Inc. v. Rice, 85 F.3d 535, 549 (11th Cir. 1996); Como Falcon Comm'y Coalition, Inc., v. United States Dept. of Labor, 609 F.2d 342, 345 (8th Cir. 1979).

that impacts of applying magnesium chloride require thorough analysis. According to UEC, such an analysis is especially vital because of the road's proximity to a lake and creek.

The Project calls for an "as needed" application of magnesium chloride to a five-mile stretch of road that leads into and out of the Project area. The application is intended to minimize airborne particulates, thereby enhancing air quality and improving visibility for road user safety. The lake referred to by UEC is approximately 1/4 mile away from the road, and the creek averages between 150 to 200 feet away from the road. The Forest Service testified that this distance is sufficient to render the potential impacts of magnesium chloride application minimal. There is one point at which the road and the creek cross, and the Forest Service states that it will employ "best management practices" at that point and along the entire road. The Forest Service decided not to independently analyze the topic within the Environmental Assessment given the apparently minimal use and minimal potential impacts of magnesium chloride application in the overall Project. The Court finds that the Forest Service did not act arbitrarily, capriciously, or in abuse of its discretion in this decision. See generally Neighbors of Cuddy Mt. v. Alexander, 303 F.3d 1059, 1071 (9th Cir. 2002) ("Although Neighbors argues that it was insufficient to analyze only the cumulative effects of the west side of the forest, under NEPA, we defer to an agency's determination of the scope of its cumulative effects review.").

### C. Failure to Analyze Cumulative Effects on Air Quality

UEC next argues that the Forest Service did not adequately analyze the effects the Project will have on air quality, particularly in conjunction with other nearby projects and private coal burners. The record shows, however, that the Forest Service adequately addressed cumulative impacts to air quality both in its Environmental Assessment and through its compliance with the

Utah Smoke Management Plan. Analysis in the Environmental Assessment considered the amount of airborne particulates, gaseous pollutants, visibility, prevention of significant deterioration designation, and proximity to class I airsheds. The Forest Service made use of a smoke emission modeling program to conclude that no measurable cumulative long-term effects would occur. In addition, the Forest Service acknowledged its committment to following the Utah Smoke Management Plan. The Utah Smoke Management Plan is specifically designed to manage and mitigate cumulative effects of prescribed fires in Utah by monitoring air quality and coordinating burns within different areas. The state can deny a burn ignition if there is concern for cumulative effects such as high airshed loading on a particular day. Monitoring of air quality under the Utah Smoke Management Plan will also take into account the effects of private coal burners in relevant areas.

The foregoing information shows that the Forest Service adequately addressed cumulative effects on air quality.

### D. Failure to Analyze Impacts on Soil Resources

UEC next argues that the Forest Service violated both NEPA and NFMA by failing to adequately analyze impacts of the Project on soil resources, including cumulative effects of livestock on riparian zones. UEC's main contention is that the Forest Service's soil analysis was faulty because it did not include any on-the-ground surveys, but instead relied only on orthophotos.

According to the record, the Forest Service did in fact conduct on-the-ground surveys. In addition, the Forest Service employed a soil erosion modeling program to calculate potential soil erosion rates for the proposed activities. The Forest Service concluded that the proposed actions

would affect soil productivity by 15% or less, which is within applicable guidelines. The Project contemplates using soil and water conservation practices. The Forest Service's failure to assess cumulative effects of livestock on riparian zones stems from the lack of any riparian zones subject to livestock use within the Project area. Given these circumstance, the Court concludes that the Forest Service acted reasonably and that it adequately assessed impacts of the Project on soil resources.

### III. ALLEGED VIOLATIONS OF NFMA

UEC argues that the Forest Service violated NFMA by failing to analyze management indicator species ("MIS") as required by 36 C.F.R. § 219.19. UEC further agues that the Forest Service violated NFMA by not conforming to guidelines in the Dixie National Forest Plan regarding old growth and road density. Each of these arguments will be addressed in turn.

#### A. Failure to Analyze Management Indicator Species

UEC argues that the Forest Service failed to analyze MIS, specifically macroinvertebrates and goshawks, as required by NFMA's 1982 regulations. The regulations direct that "[p]opulation trends of the management indicator species will be monitored and relationships to habitat changes determined." 36 C.F.R. § 219.12(g)(6). The Forest Service argues that the requirement to monitor MIS does not apply to the Project because the Project is subject to the 2000 planning rules rather than the 1982 regulations. Under the 2000 planning rules, the Forest Service need only consider the "best available science" in implementing projects and need not specifically monitor MIS. UEC and the Forest Service each cite relevant, competing authority as to whether the 1982 regulations or 2000 planning rules should apply. In this case, the Court finds

that even if the 1982 regulations apply, UEC's arguments fail because the Forest Service complied with MIS monitoring requirements.

1.      Macroinvertebrates

UEC claims that the Forest Service violated NFMA by not analyzing macroinvertebrates in the Project area as an MIS. Macroinvertebrates are used as an MIS when fish population data is not available for aquatic habitat. UEC's claim fails because the Project area does not contain aquatic habitat and thus does not require any monitoring, whether of fish or macroinvertebrates.

The Forest Service's analysis of data, maps, and field reconnaissance demonstrated that there are no perennial streams, springs, marshes, wetlands, lakes, or fisheries within the Project area.

> In locations where the necessary habitat to support a species is not present, it is rational to assume that the species is not present. Predictions of where species are located, and thus where monitoring is conducted, are based in the first instance upon the location of the appropriate habitat essential to support a species.

Utah Envtl. Congress v. Bosworth, 370 F.Supp. 2d 1157, 1170-71 (D. Utah 2005). See also Utah Envtl. Congress v. Troyer, Case No. 1:04CV00155 PGC at * 22 (D. Utah 2005) ("The record does not indicate that any body of water in the Dark Valley project provides fish habitat, and thus, there was no obligation to consider any fish habitat indicator, including macroinvertebrates, before approving the Dark Valley Vegetation Management Project."). "Where impossible, the Forest Service is not required by the applicable statutes and regulations to collect population data." Utah Envtl. Congress v. Bosworth, No. 03-4251, 2005 U.S. App. LEXIS 17619, at * 20 (10th Cir. Aug. 19, 2005).

10

UEC argues that the Forest Service should, nonetheless, have conducted monitoring on behalf of aquatic habitat existing outside of the Project area. Specifically, UEC argues that aquatic habitat near the road leading into the Project area could be substantially impacted by planned magnesium chloride application to the road. Given the Forest Service's conclusion that the magnesium chloride application was a minor part of the project and did not warrant significant attention, the Court cannot find that the Forest Service acted unreasonably by not conducting aquatic MIS monitoring outside of the Project area.

2. <u>Goshawk</u>

UEC next maintains that the Forest Service has violated NFMA by failing to manage habitat for a viable population of goshawk and that this failure is evident in the declining numbers of goshawk. Under the Dixie National Forest Plan, the Forest Service is to "[m]anage habitat for viable populations of all existing vertebrate wildlife species." The Forest Service's efforts at managing habitat for the goshawk consist of estimating the acres of suitable goshawk habitat in the forest, estimating the number of goshawk pairs needed for a viable population, calculating the amount of habitat required to maintain a viable population, and reserving well-distributed habitat in excess of that required to maintain the minium viable population. In addition, the Dixie National Forest has amended its standards and guidelines to include Utah goshawk conservation strategies, and it conducts forest-wide surveys to monitor the goshawk. Considering these efforts, the Court concludes that the Forest Service has not acted arbitrarily, capriciously, or contrary to law in its managing of goshawk habitat.

B. <u>Failure to Show Sufficient Old Growth in Drainage Areas</u>

UEC argues that the Forest Service has violated NFMA by not showing that sufficient old growth will remain in drainage areas. The Dixie National Forest Plan guidelines state that seven to ten percent of each drainage area should be managed as old growth. UEC contends that the Forest Service did not conduct the proper tests to ensure compliance with this guideline.

The Forest Service rated each forest stand in the Project area, including six drainage areas, for old growth habitat using stand exam, aerial photo interpretation, and field reconnaissance methods. UEC's argument seems to be that the Forest Service should have used an alternate or more comprehensive method of assessing old growth. The Court defers, however, to the method selected by the Forest Agency. "'[T]he agency, not a reviewing court, is entrusted with the responsibility of considering the various modes of scientific evaluation and theory and choosing the one appropriate for the given circumstances.'" Custer County Action Assn. v. Garvey, 256 F.3d 1024, 1036 (10th Cir. 2001) (quoting City of Bridgeton v. Federal Aviation Admin., 212 F.3d 448, 459 (8th Cir. 2000)). UEC's argument therefore fails.

### C. Failure to Maintain Proper Road Density

Finally, UEC argues that the Forest Service has violated NFMA by not complying with Forest Plan guidelines regarding road density. The Forest Plan provides that "road densities should not exceed 2.00 miles per square mile of wildlife habitat." Road density in the forest is currently 2.63 miles per square mile of habitat. The Project will alter the road density by decreasing it to 2.35 miles per square mile of habitat. UEC argues that the Forest Service must change the Project to provide for a density of 2.00 miles per square mile of habitat.

The Forest Service explains that the 2.00 mile guideline is part of the Forest's "long range management plan." Although the Project does not reduce road density to the target amount, it is

acceptable because it improves the road density and therefore moves the Forest toward achieving its long range goal. In view of this rationale, the Court cannot say that the Forest Service acted arbitrarily, capriciously, or in abuse of its discretion. UEC's argument thus fails.

## CONCLUSION

UEC has failed to show that the Forest Service's decision to approve the Project was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Accordingly, the Forest Service's decision is AFFIRMED.

IT IS SO ORDERED.

DATED this 13th day of October, 2005.

Dee Benson
United States District Judge